## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **TRACEY LATRICE HERD,** individually and on behalf of all others similary situated, | **CASE NO.:** |
| **Plaintiffs,** | **COMPLAINT – CLASS ACTION** |
| **v.** | **JURY TRIAL DEMANDED** |
| **BIO-LAB, INC. and KIK CONSUMER PRODUCTS, INC.** | |
| **Defendants.** | |

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiff Tracey Latrice Herd, individually and on behalf of all others similarly situated, by and through undersigned counsel, bring this action against Defendants Bio-Lab, Inc. ("BioLab") and KIK Consumer Products, Inc. ("KIK"), (collectively "Defendants").  Plaintiff alleges the following based upon information and belief, the investigation of counsel, and personal knowledge as to the allegations pertaining to themselves:

## <u>INTRODUCTION</u>

1.  This Class Action seeks redress for residents, property owners, employees and businesses living, working and/or located in and around the

September 29, 2024 fire at BioLab's chemical manufacturing facility in Conyers, Georgia (the "BioLab Facility Fire")[1], that resulted in contamination of, and exposure to, massive amounts of toxic chemicals such as chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, phosgene and other volatile byproduct compounds. As a result of this toxic chemical fire, Plaintiff and Class Members have all suffered, among other things, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption and economic damages as alleged more specifically below.

## THE PARTIES

### *Plaintiff*

2.      At all relevant times, Plaintiff Tracey Latrice Herd was an adult citizen of Georgia and an owner-occupier of real property located at 1743 McCollum Road SW, Conyers, Rockdale County, Georgia.

3.      As a result of Defendants' negligent, careless, reckless, and/or intentional conduct in connection with the September 29, 2024 toxic chemical fire, Plaintiff Tracey Latrice Herd has suffered damages, including but not limited to exposure to and inhalation of toxic chemicals, and contamination of her property by high and dangerous levels of toxic chemicals and their byproducts dispersed by Defendants into the air, soil and water. Plaintiff Tracey Latrice Herd was forced to

---

[1] The BioLab Facility Fire is in Conyers, Rockdale County, Georgia at Latitude: 33.673215 N; Longitude -84.041305 W.

avoid any outdoor activities due to shelter-in-place orders, including grocery shopping for her four children that live with her. This issue was compounded by the fact that Plaintiff Tracey Latrice Herd does not own a car and could not walk to get necessary supplies for her family. Plaintiff Tracey Latrice Herd runs a small business selling homemade meals from her house and was adversely impacted by Defendants' tortious conduct, in part, through lost business revenue.

### *Defendants*

4.     Defendant BioLab, Inc. ("BioLab") is a private corporation duly organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5.

5.     At all relevant times, BioLab owned and operated the Conyers, Georgia chemical Facility located at 1700 Covington Hwy, Conyers, GA 30012 ("Conyers Facility").

6.     Defendant KIK Consumer Products, Inc. ("KIK") is a corporation duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of business located at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5.

7.     Upon information and belief, BioLab, Inc. is a wholly owned subsidiary of KIK.

8.      Upon information and belief, BioLab has consistently held itself out as conducting business affairs as a conduit for KIK in connection with the ownership and operation of their chemical enterprise. Biolab's website refers to itself as a "division of KIK Consumer Products."[2]

9.      Upon information and belief, Defendant KIK is a 'portfolio company', owned by the Centerbridge Partners, a private equity firm, since 2015.

10.     At all relevant times, BioLab and KIK acted individually, as well as by and through one another, and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332(d) because there is complete diversity between the Defendants and at least one member of the class; there are more than 100 Class Members; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

12.     This Court has personal jurisdiction over each Defendant because they regularly engage in business within the state of Georgia including operating a chemical processing and handling facility in this District, and because the claims

---

[2] https://www.biolabinc.com/

4

asserted herein arise from the business activities and tortious conduct of Defendants within the state of Georgia prior to and at the time of the BioLab Facility Fire.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred in the Northern District of Georgia, and Plaintiff and all Class Members were injured because of tortious activity in this District.

## FACTUAL ALLEGATIONS

14.     At all times relevant, BioLab operated, and continues to operate, a chemical plant located at 1700 Covington Hwy, Conyers, GA 30012 (the "Conyers Facility").

15.      Among its operations at the Conyers Facility, BioLab receives, blends, and packages trichloroisocyanuric acid ("TCCA") into finished consumer products.

16.     TCCA is a chlorinating agent which BioLabs uses to produce products used in sanitizing swimming pools and hot tubs.

17.     In large bodies of water, such as pools, TCCA breaks down slowly to release hypochlorous acid (HClO), which kills bacteria, algae and other microorganisms. However, when TCCA comes into contact with small amounts of water or moisture, TCCA will experience a chemical reaction causing heat generation and the decomposition of the TCCA.  When TCCA reacts and decomposes, it produces toxic chlorine gas and can produce nitrogen trichloride, an

5

explosion hazard. Chlorine gas is a potentially toxic substance if inhaled, and can cause sinus and lung irritation at even low levels of exposure.

18.     According to KIK's Safety Data Sheet on TCCA, "exposure to the solid [TCCA] or to free chlorine evolving from the product" can cause serious and life-threating injuries if inhaled. Per the Safety Data Sheet, TCCA is "fatal if inhaled."

19.     The odor of chlorine gas can be detected at 0.3 parts per million ("ppm").

20.     Airborne chlorine gas > 0.5 ppm exceeds the EPA Acute Exposure Level Guidelines and can cause people to experience notable changes in lung functions.

21.     BioLab's Conyers Facility receives dry TCCA from its Lake Charles facility in Westlake, Louisiana.[3]

22.     The TCCA is packed, shipped, and stored in large containers that typically hold 2,750 pounds of the material.

23.     Upon information and belief, at any given time, BioLab has millions of pounds of TCCA inventory at the Conyers Facility.

---

[3] BioLab's Lake Charles facility also recently had a gas release incident resulting from a chemical reaction on August 27, 2020. This incident was the subject of a scathing investigation report by the U.S. Chemical Safety and Hazard Investigation Board which noted several safety issues and failings.

24.    On or about September 29, 2024, at or around 5:30 A.M., a fire suppression sprinkler at the Conyers Facility activated in an attempt to suppress a chemical fire that had broken out at the Conyers Facility. This resulted in the spraying of water onto chemicals inside the Conyers Facility, of which included TCCA.

25.    At or around 12 P.M. after being initially contained, the fire reignited while workers were attempting to contain the reactive chemicals, thereby resulting in a chemical reaction that produced a massive wall of smoke that contained toxic chemicals such as chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, and phosgene billowing throughout Rockdale County. The fire caused a "complete collapse" of the Conyers Facility building, as the roof caved in and multiple walls fell as a result of the fire.



**Figure 1**[4]

26.     BioLab did not have an adequate fire protection system in order to quickly and effectively extinguish fires at their facility while also avoiding causing dangerous chemical reactions with water-reactive chemicals.

27.     BioLab's failure to possess and utilize an effective fire protection system exacerbated the harm caused by the fire at the Conyers Facility and delayed emergency response to the fire.

28.     At approximately 1:10 P.M., Rockdale County authorities issued an Evacuation Alert asking residents living between Sigman Road and Interstate 20

---

[4] https://www.al.com/news/2024/09/conyers-biolab-fire-large-cloud-of-smoke-from-georgia-chemical-plant-blaze-seen-for-miles.html

near the Conyers Facility to evacuate immediately and announcing that Interstate 20 would be closing ("Evacuation Alert") and thereby displacing over 17,000 residents.



**Figure 2**[5]

29.    At the same time, Rockdale County authorities announced the closing of Interstate 20 in both directions between Salem Rd and Turner Hill, an eight-mile stretch of the highway, causing significant traffic disruptions. All southbound traffic on Hi-Roc Road between Irwin Bridge and Highway 138 was shut down, and all traffic from Highway 138 to Interstate 20 from Turner Hill Road to Salem Road was shut down.

---

[5] https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/



**Figure 3**[6]

30.    Interstate 20 remained closed on September 30, 2024, causing additional traffic disruptions.

31.    Evacuated residents were unable to return to their homes to obtain personal items and necessities, including medication, technology, and communication devices to inform loved ones of their wellbeing.

32.    At approximately 7:45 P.M., Rockdale County authorities issued a shelter-in-place order for all residents of Rockdale County ("Shelter-in-Place

---

[6] https://www.ajc.com/news/crime/conyers-chemical-plant-fire-what-to-know/ZECJVWIRDNCR5P2DZJFSAXUQ2A/

Order") between 7:45 p.m. and midnight. More than 77,000 residents were affected and could not leave their homes.



**Figure 4**[7]

33.     Those sheltering in place were asked by County officials "to turn the air conditioning off and keep windows and doors shut."[8]

---

[7] https://www.dailymail.co.uk/news/article-13907263/shelter-place-order-extended-georgia-biolab-fire-conyers.html
[8] https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/

34.    The Shelter-in-Place order was extended on or about September 30, 2024 and all businesses in Rockdale County were asked to close operations.[9]

35.    Piedmont Rockdale Hospital evacuated patients and announced that the hospital was on diversion, delaying care for those in need of emergency medical treatment.[10]

36.    Newton County Schools closed all schools on September 30, 2024, due to the fire and toxic smoke and dust plume from the Conyers Facility.[11]

37.    Georgia Piedmont Technical College closed both their Newton and Rockdale campuses until further notice because of the fire and toxic smoke and dust plume.

38.    Government buildings, including the Rockdale County Courthouse, Administration Building, Water Resources, Elections Office, Animal Services, Tax Commissioner, and Board of Commissioner's Office were all closed on September 30, 2024, due to the fire and toxic smoke and dust plume.

---

[9] https://www.rockdalecountyga.gov/rockdale-county-remains-closed-with-shelter-in-place-continuing/

[10] https://www.11alive.com/article/news/local/conyers-chemical-plume-biolab-fire-latest-updates-monday-september-30/85-2a4ac3d6-4263-4b25-aec8-5d0865c7c960

[11] https://www.newtoncountyschools.org/departments/public_relations/news/schools_closed_monday__september_30?fbclid=IwY2xjawFm09ZleHRuA2FlbQIxMAABHQ-KlsTtwU5LXzxpISGupG0F0A2fijFc32ZrSQSNx2GxNd1uQSyYwVLQug_aem_7E6-2smPIyp0ljqw_kYpxg

39.     The City of Conyers closed City Hall, municipal court, and Conyers University through October 2, 2024, and cancelled a Conyers Downtown Development Authority meeting scheduled for October 1, 2024.

40.     Government offices in nearby Newton County closed on September 30, 2024, as well due to health concerns.

41.     Churches in Rockdale County, and from Rockbridge to Northside County, were all asked to cancel or immediately end services on Sunday, September 29, 2024.

42.     The Rockdale County Fire Rescue, the local fire department, was dispatched to respond to the fire at the Conyers Facility.

43.     The Rockdale County Emergency Management Agency mobilized in response to the fire. The state also sent officials from the Georgia Environmental Protection Division ("EPD") to respond and assess the air quality after the fire.

44.     The Georgia Department of Transportation managed road closures and accompanying transportation delays in response to the fire.

45.     The Federal Environmental Protection Agency ("EPA") also responded, assisting in air quality monitoring and assessment, and the Federal Emergency Management Agency ("FEMA") was called to respond and assist in emergency management as well.

46.     Shelter locations and evacuation sites were established for affected residents, including sites in Lithonia, Covington, and Stockbridge, with assistance from the American Red Cross and DeKalb County Emergency Management.

47.     Beginning on September 29, 2024, and continuing through the date of this Complaint, Rockdale County residents have been unable to use and enjoy their indoor and outdoor property as a result of the debris and poor air quality caused by the fire.

48.     The EPD and the EPA conducted air quality surveys on September 29 and 30, 2024, and the results indicated "the harmful irritant chlorine" emitting from the Conyers Facility. The chlorine was present in the plume of smoke coming from the facility, and wind patterns made the toxic chlorine pollution follow an "unpredictable path."[12]

49.     Residents living near the Conyers Facility have observed smoke and ash debris on their property and around their homes.

50.     The toxic smoke and dust plume caused concern in counties adjacent to Rockdale County. Newton County closed schools and government buildings. Walton County dispatched the Walton County Emergency Management Agency and the Walton County Fire Rescue to aide in the response to the fire and toxic smoke

[12] https://www.rockdalecountyga.gov/rockdale-county-remains-closed-with-shelter-in-place-continuing/

and dust plume. Walton County also advised residents to turn off your air conditioners, turn on your ceiling fans, and if possible, bring your outside animals indoors."[13]

51.     Rockdale County residents do not have any idea as to how long the air at their homes will remain poisonous to breath or how long health advisories will remain in effect.

52.     The Conyers Facility has a long history of fires and incidents in which hazardous chemicals escaped and adversely impacted residents in the surrounding areas, including incidents in 2004, 2016 and 2020.[14]

## CLASS ACTION ALLEGATIONS

53.     This action is brought as a class action under Fed. R. Civ. P. 23.

54.     Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiff seeks to certify and represent a Class defined as follows:

> All persons, including businesses, property owners or renters subject to the evacuation or shelter in place advisories, and all other persons, including businesses, exposed to chlorine or other hazardous chemicals, as a result of the fire/chemical reaction and release of chlorine and other hazardous chemicals at the Conyers Plant beginning on September 29, 2024.

---

[13] https://news.monroelocal.org/update-sept-30-from-walton-county-ema-air-is-safe-to-breath-but-recommends-to-stay-indoors/

[14] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

55.    Specifically excluded from the Class are Defendants, including any parent, subsidiary, affiliate, or controlled person of Defendants; Defendants' officers, directors, agents, or employees, the judges assigned to this case, their immediate families, and court staff, and insurers and insurance syndicates whose claims for damages regarding the September 29, 2024 BioLab Facility Fire and resulting toxic chemical explosion, arise out of a right of subrogation.

56.    Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or subclassing after having had an opportunity to conduct discovery.

57.    This action meets the jurisdiction amount under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6) because the amount of damages sought on behalf of the putative class exceeds $5,000,000. The putative class consists of tens of thousands of Class members who seek to recover for the losses suffered as a result of evacuation and shelter in place orders, as well as exposure to toxic chemicals, caused by Defendants' wrongful conduct, as described in this Complaint.

### *Numerosity and Ascertainably*

58.    This action satisfies the requires of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impracticable.

59.     Although the exact number of members of the Class is currently unknown to Plaintiffs, tens of thousands of people live in Rockdale County alone, thousands of properties were subject to the Evacuation Alert, and thousands of pieces of real and personal property were affected. Class members may be identified through objective means, including objective data available to the Parties regarding the persons and property present in the affected areas following the fire. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, social media and/or published notice. Thus, pursuant to Rule 23(a)(1) of the Federal Rules of Civil Procedure, the large size of the Class renders the Class so numerous that joinder of all individual members is impracticable.

### *Predominance of Common Issues*

60.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because this action involves common questions of law or fact that predominate over questions affecting only individual Class Members.

61.     The common questions include, but are not limited, to the following:

> a.  Whether Defendants' acts or omissions as set forth herein, breached a duty of reasonable care, and caused or contributed to the fire, chemical reaction, resulting chemical explosion, subsequent release of toxic chemicals, contamination, and evacuation and/or 'shelter in place' orders.

b.  Whether Defendants are strictly liable for injuries and damages suffered by Plaintiffs and Class Members because Defendants engaged in abnormally dangerous and/or ultrahazardous activities.

c.  Whether Defendants violated Georgia statutory nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property.

d.  Whether Defendants created a private nuisance through their acts and omissions, including by the release of toxic contaminants.

e.  Whether Defendants created a public nuisance through their acts and omissions, including by the release of toxic contaminants.

f.  Whether Defendants committed trespass on the property of Plaintiffs and the Class Members by their acts and omissions, including by causing hazardous material to enter and contaminate said property.

g.  Whether the Plaintiffs and the Class Members have suffered loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or economic damages as a result of the Defendants' acts or omissions.

h.  Whether the Plaintiffs' and the Class Members' businesses have suffered a loss of income and/or diminution in value as a result of the Defendants' acts or omissions and subsequent events, including forced closings.

i.  Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the fire, chemical reaction/explosion, and subsequent release of toxic and hazardous substances.

### *Typicality*

62.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants.

63.     Plaintiffs own property, reside in, work and/or operate a business within the Class Zone.

64.     Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

65.     Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts and omissions in which Defendants engaged.

66.     Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

### *Adequacy*

67.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the interests of the Class. Plaintiffs have no conflicts of interest that will interfere with the maintenance of this class action. Plaintiffs' counsel has substantial experience in prosecuting complex class actions, including actions with issues, claims, and defenses similar to the present case.

68.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

### *Predominance and Superiority*

69.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct predominate over any questions affecting only individual Class Members.

70.     Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. Moreover, the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

71.     The prosecution of this case as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties'

resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, any challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

72.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority, discretion, and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; and utilize Rule 23(c)(5) to divide any Class into subclasses.

## MEDICAL MONITORING CLASS INJUNCTIVE RELIEF PURSUANT TO RULE 23(b)(2)

73.     Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class and that require court imposition of uniform

relief, thereby making appropriate equitable relief to the Class as a whole within the meaning of Rules 23(b)(2).

74.    As set forth above, Plaintiffs are not asserting damages claims for the physical manifestation of a current toxicity injury, Plaintiffs and Class Members without a present injury and have no adequate remedy at law for increased risk of injury from exposure, in that monetary damages alone would not compensate for the insidious and latent manifestation of the harm to them, rendering declaratory, injunctive, and other equitable relief appropriate.

75.    Plaintiffs seek equitable relief in the form of a medical monitoring program and establishment of a medical monitoring fund, and further request injunctive relief compelling Defendants to finance the medical monitoring program and address issues as they develop during program administration.

76.    As a direct and proximate result of Defendants' wrongful conduct as set forth above, Plaintiffs and the Class Members have actually been exposed, and will continue to be exposed, to toxic substances and toxic fumes, and will continue to suffer a significantly increased risk of serious injury and diseases. This increased risk is such that a reasonable physician would order medical monitoring, including but not limited to periodic diagnostic medical testing and necessary examinations.

77.     Timely-instituted medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure

78.     The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and the Class Members resulting from their exposure to chlorine gas and other toxic substances released by the chemical explosion at Conyers Facility, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and well-being of Plaintiffs and the Class Members they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist that make the early detection of exposure to those toxic substances, toxic fumes and potential carcinogens that were released into the class area as a result of the chemical explosion, as well as early detection of disease, both feasible and beneficial.

79.     Establishment of a Court-supervised medical monitoring program can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for the above-referenced examination and testing procedures and related activities, guaranteeing the purely equitable use of any trust fund proceeds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

80.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities, and education programs are a matter for the Court to decide, after hearing and consultation with medical, industrial, modeling, and other experts. Class adjudication of the right to this relief is both appropriate and necessary.

81.    The medical monitoring program should (a) be generally supervised by the Court and may be directly managed by Court-appointed, Court-supervised special masters or trustees; (b) involve the monitoring of all Class Members by designated physicians under a Court-approved medical treatment and research regiment; and (c) involve the collection of medical data utilized for group studies, as well as monitoring and treatment of individuals. During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT I
## NEGLIGENCE

82.    Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

83.    Defendants actively participated in the processing, handling and storage of hazardous chemicals at its Conyers Facility, and as such owed duties of care in that regard.

84.     Defendants owed a duty to maintain, monitor, oversee, inspect, and control the Conyers Facility to avoid the release of harmful chemicals into the surrounding community.

85.     Defendants breached these duties, and others, by negligently packaging, maintaining, storing, controlling, overseeing, inspecting, and/or and monitoring the hazardous chemicals.

86.     Further, Defendants breached these duties by allowing the hazardous chemicals to burn, react or otherwise escape from the Conyers Facility into the surrounding community.

87.     Defendants owed Plaintiffs and the Class a duty to exercise due care in the manufacturing, maintaining, controlling, overseeing, inspecting and handling of hazardous chemicals.

88.     Defendants breached these duties, and others, by negligently manufacturing, maintaining, controlling, overseeing, inspecting, and/or and monitoring the hazardous chemicals.

89.     Further, Defendants breached these duties by allowing the hazardous chemicals to burn, react or otherwise escape from the Conyers Plant into the surrounding community.

90.     Given the proximity of neighboring property owners, residents, workers, and businesses, and the propensity of catastrophic damage to those

individuals and entities in the event of a fire or chemical explosion, Defendants owed and breached a duty to implement and promote safety procedures in every area of its operations.

91.     Defendants owed and breached a duty of reasonable care commensurate with the risks associated with receiving, handling, processing, and storing hazardous and toxic materials.

92.     Defendants were required to conform their conduct to applicable federal, state, and local legal requirements, including without limitation the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act, the federal Comprehensive Environmental Response Compensation and Liability Act, including specifically the Emergency Planning and Community Right-to-Know Act, Georgia Water Quality Control Act, The Georgia Waste Control Act, the Georgia Hazardous Site Response Act, the Georgia Comprehensive Solid Waste Management Act, and the regulations promulgated pursuant to the statutes.

93.     Plaintiff and Class Members are members of the class of persons for whom legal requirements applicable to Defendants' conduct were designed to protect.

94.     As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the other Class members suffered property damage, lost profits, loss of use, and expected diminution of property value.

95.   As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the other Class members have incurred, and will continue to incur, monetary damages arising from the property damage, lost profits, loss of use, and diminution of property value at an amount to be proven at trial.

## COUNT II
## WILLFUL AND WANTON CONDUCT

96.   Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

97.   At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and the Class Members.

98.   Defendants were, at all times relevant, aware that TCCA is toxic and harmful to humans.

99.   Defendants were aware, at all times relevant, that considerable safety and care was required in the handling, processing, and storage of TCCA.

100.   Defendants were aware, at all times relevant, when TCCA comes in contact with or is moistened by a small amount of water, it can experience a chemical

reaction, generating heat and causing the decomposition of the chemical, which in turn produces toxic chlorine gas and can produce explosive nitrogen trichloride.

101.   Defendants, at all times relevant, had thousands of tons of TCCA stored at its facility.

102.   Defendants were aware, at all times relevant, that this volume of TCCA posed a significant risk for a catastrophic chemical fire.

103.   Defendants were aware, at all times relevant, that tens of thousands of people were at risk of injury should there be a chemical fire at its facility.

104.   Upon information and belief, Defendants were aware, at all times relevant, that as little as 0.5 ppm of airborne chlorine gas, could cause injury.

105.   In fact, Defendants previously had multiple chemical fires involving large quantities of TCCA that resulted in evacuations and shelter-in-place orders to the surrounding communities.

106.   In a 2010 hazard analysis conducted at BioLab's Lake Charles facility, it was advised that the company evaluate its warehouse roof to ensure that it was not susceptible to damage from high winds and/or being exposed to rainwater. However, BioLab disregarded this recommendation.

107.   In 2017, severe weather led to flooding of a BioLab chemical facility in Crosby, Texas.  The water caused chemicals to decompose and resulted in a massive fire, the release of hazardous chemicals and the evacuation of area residents.

108.    Following this incident, the Centers for Chemical Process Safety issued new industry guidance to help hazardous chemical facilities, like BioLab, ensure they were prepared for severe weather events, like flooding, so chemical incidents could be prevented.

109.    However, BioLab elected not implement the industry guidance and continued operating at its Lake Charles facility, unprepared for severe weather.

110.    On August 27, 2020, BioLab's Lake Charles facility suffered damage to buildings storing TCCA, allowing rainwater to come into contact with the chemical and initiating a chemical reaction that resulted in a catastrophic fire, releasing a large plum of hazardous gases, including toxic chlorine gas, into the air. This resulted in a shelter-in-place order in the community.

111.    Despite knowing that water coming into contact with stored TCCA could result in catastrophic damage - risking injury to employees and neighboring residents and businesses - BioLab's Conyers Facility was not equipped with an automated water detector or alarm system to alert employees of a leak.  Areas storing TCCA did not have any active floor drains and maintenance was not proactively done to guard against water hazards.

112.    Defendants have had a history of incidents that have harmed the public.

113. On or around May 25, 2004, a warehouse at the Conyers Facility containing roughly 12.5 million pounds of chemicals burned. This fire caused thousands of residents to evacuate.

114. On or around June 4, 2016, the Rockdale County Fire Department responded to a chemical decomposition incident at this same location.

115. On September 14, 2020, a water line leak in the Conyers Facility resulted in TCCA decomposition and release of large amounts of chlorine gas. Georgia Interstate 20 was shut down for 6 hours while chemical plumes were emitting from BioLab. [15] Air monitoring stations were later set up in residential areas and business properties near the facility. Measured chlorine concentrations were as high as 12 ppm. Chlorine gas is immediately dangerous to life at a concentration of 10 ppm.

116. On September 18, 2020, a second TCCA decomposition event occurred at the Conyers Facility, again releasing chemical plumes of toxic chlorine gas into the air. It was determined that this event occurred due to BioLab efforts to save, relocate, and/or store bags of TCCA that had likely gotten wet from the September 14, 2024 event.

---

[15] https://www.ajc.com/news/business/chlorine-product-maker-biolab-has-history-of-fires-and-chemical-leaks/ET4CU6BAVVD55C2BMLTT7PQ2TY/

117.    Defendants were absolutely aware, at all times relevant, of the considerable risks of TCCA decomposition that could result in the unreasonably dangerous emission of hazardous materials, including chlorine gas, into the surrounding community.

118.    Defendants' repeated incidents involving similar fires, smoke plumes, chemical releases, and toxic smoke and dust emissions from the Conyers Facility reflect a pattern of bad faith, reckless, and willful and wanton conduct on the part of Defendants. Defendants' failure to address the causes of previous incidents and allowing BioLab Facility Fire to occur without adequately updating fire protection systems and emergency procedures represent bad faith, reckless, and willful and wanton conduct on the part of Defendants.

119.    Defendants' misconduct has been willful, malicious and in reckless and wanton disregard for the rights of Plaintiff and of others. As such, Defendants should be required to pay punitive damages in an amount that will deter such misconduct in the future.

## COUNT III
## STRICT LIABILTY

120.    Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

121.   At all times mentioned herein, Defendants were engaged in the handling, processing, and storage of thousands of tons of TCCA, as well as other toxic or hazardous chemicals, which constitutes abnormally dangerous and/or ultrahazardous activity.

122.   Defendants' handling, processing, and storing of these hazardous chemicals at their Conyers Facility, created foreseeable and significant potential harm to people and property in the surrounding area.

123.   Because these activities are abnormally dangerous and/or ultrahazardous, Defendants are strictly liable for any injuries proximately resulting from them.

124.   Defendants are strictly liable for any and all damages which may occur or arise out of their distribution, transportation, storage, use and handling of chlorine and other hazardous chemicals regardless of their standard of care.

125.   The harm to Plaintiff and the Class members, as alleged in this Complaint and incorporated by reference, was and is the kind of harm that would be reasonably anticipated based on the risks created by handling, processing, and storing large quantities of hazardous chemicals near residential, commercial, and agricultural areas.

126.   As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff and the Class Members have suffered and will continue to suffer

decreased property values, damage to their real and personal property, interference with enjoyment of life and/or use of property, aggravation, an increased risk of associated disease or illness and a fear of the same, lost wages, loss of business income, and loss of business goodwill.

127.    Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiff and the Class Members, which were a direct and proximate result of the BioLab Facility Fire and release of hazardous substances which harmed Plaintiff and the Class as described above.

128.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's and the Class Members' rights so as to warrant the imposition of punitive damages.

## COUNT IV
## PRIVATE NUISANCE (O.C.G.A §§ 41-1-1, 41-1-2, 41-1-4)

129.    Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

130.    Plaintiff and Class Members have legitimate possessory rights in affected property near the Conyers Plant and legally protected interests.

131.    In causing and allowing hazardous chemicals to escape from their Conyers Facility into the open air through their reckless and negligent conduct or

omissions, Defendants caused hurt, inconvenience and damage to Plaintiff and Class Members.

132.    Defendants invaded Plaintiff's and Class Members interests in their property, including their interest in the use and enjoyment of their property, causing nuisance.

133.    The invasion of the use and enjoyment of Plaintiff's and Class Members' lands by Defendants was intentional and/or unreasonable. Defendants knew or should have known their conduct would cause a nuisance to Plaintiff and Class Members.

134.    The noxious chemical plume constitutes a continuing nuisance through the invasion of Plaintiff's and Class Members' property.

135.    Defendants created, maintained and controlled the nuisance.

136.    The invasion of the use and enjoyment of Plaintiff's and Class Members' properties by Defendants was negligent, and/or reckless, and/or caused by an abnormally dangerous activity.

137.    Defendants acted with intent in interfering with the use and enjoyment of Plaintiff's and Class Members' properties and legally protected interests.

138.    Defendants' activities violated certain state, and local laws, ordinances, and regulations.

139.    These state and local laws, ordinances, and regulations are intended to benefit the public and protect them from exposure to harmful quantities of toxic chemical compounds, and to further protect them from interference with the reasonable use and enjoyment of the properties.

140.    Defendants operated and maintained the Conyers Facility, which released harmful quantities of chlorine and other hazardous chemicals into the air, soil, and water.

141.    As a direct and proximate result of this nuisance, Plaintiff and the other Class members suffered unacceptable and unreasonable interference with their rights to use and enjoy their properties, interference they should not be required to suffer without compensation.

142.    Plaintiff and Class members in this action have sustained harm that is special and distinct from the harm suffered from the general public: Plaintiff and Class members have lost business opportunities, have been exposed to heightened levels of annoying, obnoxious, foul and disgusting fumes/emissions emanating from the Conyers Plant, and have been forced to evacuate their homes and businesses or to vacate the outdoors on at least one occasion.

143.    Plaintiff's and the Class Members' special damages and injuries include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, the depreciation or

reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, and evacuation and relocation expenses.

## COUNT V
## PUBLIC NUISANCE (O.C.G.A §§ 41-1-1, 41-1-2, 41-1-3)

144.   Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

145.   Plaintiff and Class Members have legitimate possessory rights in affected property near the Conyers Plant and legally protected interests.

146.   In causing and allowing hazardous chemicals to escape from their Conyers Facility into the open air through their reckless and negligent conduct or omissions, Defendants caused hurt, inconvenience and damage to Plaintiff and Class Members, causing nuisance.

147.   Defendants' nuisance caused interference to the public at large in the exercise of rights common to all.

148.   The release of harmful quantities of chlorine and other hazardous chemicals is an unreasonable interference with the rights common to the general public to enjoy, peacefully and unimpeded, the air, soil, and water in the surrounding community.

149.   The noxious chemical plume constitutes a continuing nuisance through the invasion of Plaintiff's and Class Members' property.

150.    Defendants created, maintained and controlled the nuisance.

151.    As a result of Defendants' tortious conduct, Plaintiff and Class Members suffered injury and special damages.

152.    Plaintiff's and Class Members' injuries and special damages are the direct and proximate result of Defendants' conduct as alleged above.

153.    Plaintiff's and the Class Members' special damages and injuries include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, and evacuation and relocation expenses.

## COUNT VI
## TRESPASS

1.    Plaintiff adopts and incorporates by reference the allegations asserted above as if fully set forth herein.

2.    Plaintiff has legitimate possessory rights in affected property near the Conyers Facility and legally protected interests.

3.    At all times relevant hereto, Defendants knew or should have known that TCCA, chlorine gas, other contaminants, and byproducts, were hazardous and harmful to real property and humans, and it was substantially certain that improper

handling, processing, and/or storage of these chemical materials would cause injury to Plaintiff and the Class Members and their property.

4.     Defendants, through their conduct and omissions, caused hazardous materials to

enter and contaminate Plaintiff's and the Class Members' property.

5.     Defendants' negligent, reckless, and/or intentional conduct and omissions resulted in the chemical fire and the discharge, spread, and release of massive plumes of smoke and hazardous gases.

6.     Defendants caused harmful quantities of chlorine and other hazardous chemicals to be released from the Facility and to enter upon the homes, land, soil, and water of the Plaintiff and Class Members.

7.     Defendants knew, or should have known, that such discharges would enter onto Plaintiff's and Class Members' properties.

8.     Defendants' conduct displayed indifference to and disregard for Plaintiff's and the Class Members' rights to their property.

9.     Defendants, through their activities regarding its Conyers Facility operations and the handling, processing, and storage of hazardous materials, displayed indifference to, and disregard for, Plaintiff's and the Class Members' rights to their property.

10. Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

11. The invasion, presence, and spreading of the chlorine and other hazardous chemicals released by Defendants from the Facility unreasonably interferes with the Plaintiff and Class Members' exclusive right of possession in said properties and constitutes trespass and continuing trespass.

12. As a direct and proximate result of the trespass and continuing trespass, Plaintiff and Class Members sustained, and continue to sustain impairment to their legally protected interest in their property as well as economic and property damage.

13. Plaintiff's and the Class Members' damages include the need for remediation and continued testing of air, water, and soil to ensure they are safe.

14. Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's and the Class Members' rights so as to warrant the imposition of punitive damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. For an Order certifying the Class, as defined above, and appointing Plaintiff and their Counsel to represent the Class;

b. For damages, including compensatory, punitive, incidental, consequential and exemplary damages, in an amount determined to be just and reasonable;

c. For an award of attorney's fees, costs, and litigation expenses, as allowed by law;

d. For pre- and post-judgment interest on all amounts awarded;

e. For injunctive and declaratory relief, as allowed by law; and

f. Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Trial by jury is demanded.


Dated: October 4, 2024


Respectfully submitted,


/s/ Elliot S. Bienenfeld
Elliot S. Bienenfeld
Georgia Bar No. 667152
Elliot.Bienenfeld@BeasleyAllen.com
Rhon E. Jones*
Rhon.Jones@BeasleyAllen.com
Matthew R. Griffith*
Matt.Griffith@BeasleyAllen.com
Gavin F. King*
Gavin.King@BeasleyAllen.com
Wesley D. Merillat*
Wesley.Merillat@BeasleyAllen.com
**Beasley, Allen, Crow, Methvin,**
**Portis & Miles, P.C.**
P.O. Box 4160

Montgomery, Alabama 36103
Tel: (334) 269-2343
Fax: (334) 954-7555
Attorneys for Plaintiff

*Pro Hac Vice forthcoming*